Filed 3/22/22

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CURTIN MARITIME CORP., | D078217 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2019-00055796-CU-BT-CTL) |
| PACIFIC DREDGE AND CONSTRUCTION, LLC, et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of San Diego County, Richard S. Whitney, Judge. Reversed and remanded with directions.

Law Offices of Clinton D. Hubbard, Clinton D. Hubbard; Miller Johnson Law, Jon B. Miller, Scott A. Johnson; and Kevin C. Young for Defendants and Appellants.

King & Spalding, Joseph N. Akrotirianakis, Aaron Craig and Matthew V.H. Noller for Plaintiff and Respondent.

Curtin Maritime Corp. (Curtin) filed suit against its competitor, Pacific Dredge and Construction, LLC (Pacific), asserting one cause of action for

violation of the Unfair Competition Law (UCL, Bus. & Prof. Code, § 17200, et seq.). The parties operate dredging vessels, which are designed to clear sediment from harbor entrances, and compete for contracts awarded by the U.S. Army Corps of Engineers (USACE). In its complaint, Curtin alleged Pacific was ineligible for two contracts it was awarded over Curtin because its vessel was not "entirely" built in the United States, a violation of the federal Merchant Marine Act of 1920 (commonly referred to as the Jones Act), and Pacific defrauded the Coast Guard in its successful application for certification that the vessel was U.S.-built. These allegations served as the sole basis for Curtin's UCL claim.

In response to the complaint, Pacific brought a motion under Code of Civil Procedure section 425.16 to strike Curtin's claim, asserting it arose from protected speech and that Curtin could not show a probability of prevailing on the merits of its claim.[1] The trial court agreed with Pacific that the claim arose from protected activity, but concluded Curtin had met its burden at this early stage of litigation to show the claim had minimal merit and denied the motion. Pacific appeals the ruling, contending the trial court erred because the claim is preempted by the Jones Act.

After Pacific filed its notice of appeal, Curtin dismissed the underlying lawsuit and filed a motion to dismiss the appeal as moot. Pacific opposed the motion, asserting the appeal was viable since reversal of the trial court's order would provide Pacific the opportunity to seek attorney fees under the anti-SLAPP statute. We agree with Pacific that the appeal is not moot, and dismissal of the appeal is not appropriate. Further, we conclude Curtin has

---

[1]     Code of Civil Procedure section 425.16 is commonly referred to as the anti-SLAPP (strategic lawsuit against public participation) statute. (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 732, fn. 1.) Subsequent undesignated statutory references are to the Code of Civil Procedure.

2

not shown a probability of prevailing on the merits of its claim. Accordingly, we reverse the trial court's order denying Pacific's motion to strike and direct the court to reinstate the case and issue an order granting the anti-SLAPP motion and striking Curtin's claim.

FACTUAL AND PROCEDURAL BACKGROUND

In 2015, Pacific purchased a barge-mounted dredging vessel called the La Encina. The vessel was built in the United States in 1954 by the American Steel Dredge Company for its original owner, the San Diego Gas & Electric Company. At the time of Pacific's purchase, the vessel was in poor condition and needed a hull replacement.

To begin the renovation of the vessel, Pacific purchased 58 pre-fabricated steel panels from a domestic manufacturer and arranged for delivery of 39 of the panels to a shipyard located in Ensenada, Mexico. Pacific planned to have the panels welded together in Ensenada and shipped back to Pacific's shipyard for installation as part of a new hull for La Encina. Before that work occurred, Pacific's maritime and Coast Guard documentation consultant, Paul Larson, provided an opinion letter to Pacific's president, Grant Westmorland, concerning whether the foreign work would "disqualify La Encina from being considered U.S. built" for purposes of the Jones Act.

Larson explained in his letter that Title 46, Code of Federal Regulations, section 67.177 prescribes whether rebuilding in a foreign shipyard of a U.S. built vessel results in the vessel losing its eligibility to engage in coastwise trade.[2] Larson opined that under the regulation, a

_____

[2] Under the Jones Act, to perform dredging work in the navigable waters of the U.S., a vessel must have a coastwise endorsement issued by the Coast Guard. In order to be eligible for the endorsement, the vessel must be built in the U.S. (46 U.S.C. § 12112(a)(2)(A), 46 C.F.R. §§ 67.19, 67.97.)

3

vessel is considered "rebuilt foreign" (and thus ineligible for coastwise trade) if "any considerable part of its hull or superstructure is built upon or substantially altered outside of the United States." (46 C.F.R. § 67.177.) The regulation contains a safe harbor for rebuilt vessels where work performed outside the country on the hull or superstructure "constitutes 7.5 percent or less of the vessel's steelweight prior to the work." (*Id*., (b)(3).)

Larson concluded that so long as the La Encina had an existing coastwise endorsement, the work planned in Ensenada would not jeopardize its coastwise eligibility because it constituted just .004 % of the vessel's steelwork. However, Larson explained that the safe harbor would only apply if Pacific possessed a coastwise endorsement for the vessel. If not, Larson recommended Pacific cancel the planned foreign work and instead construct the new hull in Pacific's domestic shipyard, then apply to the Coast Guard for a coastwise determination in accordance with the regulations governing new vessels.

Although the La Encina was built in the U.S., Pacific could not obtain a coastwise endorsement because the builder had gone out of business long before. As a result, Pacific abandoned its plan to assemble a new hull for the La Encina in Ensenada. The Ensenada shipyard had not completed the welding work. It had moved the panels into place and supported them with tack-welding, which the shipyard owner described as a temporary process to keep metal pieces aligned before permanent welding occurs. The panels were then sent to Pacific's shipyard in San Diego.

There, the tack welds to the 39 panels were gouged or grinded out and the 58 new steel panels were incorporated into a new vessel Pacific named the Sandpiper. The construction of the Sandpiper occurred in San Diego in Pacific's shipyard. Pacific reused some parts of the La Encina, but the parts

for the vessel's hull and superstructure were sourced, assembled, and constructed entirely in the United States. After the Sandpiper was constructed, Pacific petitioned the Coast Guard for a certificate of documentation and coastwise endorsement, which was granted on October 25, 2016.

In 2016, the USACE solicited bids for a multi-year dredging project at the Santa Barbara harbor. Curtin and Pacific were the only two bidders and the USACE awarded the contract to Pacific, which had the lower bid and would use the Sandpiper to perform the work. Thereafter, the Coast Guard's National Vessel Documentation Center (NVDC) received a complaint that the Sandpiper was not eligible for a coastwise endorsement because it was built in Mexico, and therefore had been improperly awarded the contract.

On December 13, 2017, the director of the NVDC, Christina Washburn, notified Pacific that the agency had opened an investigation into whether certain vessels were foreign rebuilt, and made a demand under its regulations for information and documentation. Washburn's letter noted that Pacific's responses were subject to penalties under the Jones Act if misrepresentations were made to the Coast Guard. On January 7, 2018, an NVDC staff attorney sent an email to Westmorland seeking additional specific information about the construction of the Sandpiper.

Pacific provided the requested information and documents to the NVDC and retained Larson to investigate its vessels and prepare a report addressing the NVDC's concerns. The information and Larson's report were sent to the NVDC staff attorney on January 11, 2018. Larson's report provided detailed information regarding the original repair plans for La Encina, the work performed in Mexico, the termination of that work, and the return to San Diego of the 39 steel panels later incorporated into the

5

Sandpiper. On January 18, 2018, the staff attorney emailed Westmorland and stated that based on the information Pacific provided, the NVDC's review of Pacific's vessels was closed. The coastwise endorsement previously granted for the Sandpiper remained valid.

In 2019, the USACE solicited bids for another multi-year contract to perform dredging services in the Santa Barbara harbor. On October 21, 2019, days before the bids were due, Curtin filed the underlying complaint in this case against Pacific. As noted, the complaint contains just one cause of action, violation of the UCL based solely on Curtin's allegation that the Sandpiper was not eligible for its coastwise endorsement.[3] Curtin asserted that Pacific fraudulently misrepresented information about the construction of the Sandpiper to the Coast Guard.

After Curtin's complaint was filed, both parties submitted their bids for the USACE contract for dredging work in the Santa Barbara harbor. Pacific's bid was again lower than Curtin's bid. Before the contract was awarded, Curtin submitted a bid protest to the USACE asserting that the Sandpiper was a foreign-built vessel and that Pacific had defrauded the Coast Guard in obtaining its coastwise endorsement. In December 2019, the USACE rejected the protest, concluding Pacific's bid was sufficiently responsive and that a disputed coastwise endorsement was not an adequate basis under the applicable laws for the rejection of a bid.

---

[3] The UCL proscribes "unfair competition," which the statute describes as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising…." (Bus. & Prof. Code, § 17200.) "By proscribing 'any unlawful' business practice, 'section 17200 "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable." (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180.)

6

Shortly after, Pacific filed its anti-SLAPP motion, asserting Curtin's claim was based on Pacific's exercise of its right to petition and free speech in the form of its application for a coastwise endorsement to the Coast Guard. Pacific also asserted Curtin could not show a probability of prevailing on its complaint. Curtin was granted leave to conduct limited discovery and then filed its opposition to the motion, arguing both that its claim did not arise from protected speech and that even if it did, it had a probability of prevailing.

Pacific's reply brief was supported by additional evidence of the work in Ensenada and the Coast Guard's issuance of the coastwise endorsement, which it had also submitted to the NVDC. Pacific argued Curtin had not met its burden to show a probability of prevailing because both the Coast Guard and the USACE had reviewed the issue and found the Sandpiper eligible for the endorsement, and because the position advanced by Curtin, that the tack-welding that had been done on the steel plates disqualified the Sandpiper, was meritless. Pacific also asserted that Curtin's argument lacked merit because the endorsement was not required for the vessel for the Santa Barbara contracts at issue.

The court issued a tentative ruling denying the motion before the hearing on Pacific's motion. At the hearing, Pacific's counsel argued that the court did not have jurisdiction to second guess the Coast Guard's determination that the Sandpiper was eligible for its coastwise endorsement. Further, he asserted there was no evidence any information about the La Encina or the assembly of the Sandpiper was withheld from the Coast Guard. At the conclusion of the hearing, the court confirmed its tentative ruling denying the motion.

In its final order, the court explained it agreed with Pacific that Curtin's claim arose from protected speech. However, the court found that the opinion of the plaintiff's ship building expert, that the Sandpiper was not eligible for the coastwise endorsement because of the tack-welding in Ensenada of the steel plates that later became part of the Sandpiper's hull, was sufficient to demonstrate "minimal merit" of the UCL claim. Pacific timely appealed from the order denying its anti-SLAPP motion.

After Pacific filed its opening brief in the appeal, Curtin filed a motion to dismiss the appeal as moot based on its recent voluntary dismissal of the underlying complaint. Pacific opposed the motion, and this court issued an order deferring its decision on the motion to the merits determination.

DISCUSSION

I

*Legal Standards*

Section 425.16 sets a procedure for striking "lawsuits that are 'brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.' " (*Kibler v. Northern Inyo County Local Hosp. Dist.* (2006) 39 Cal.4th 192, 197.) Under section 425.16, the "trial court evaluates the merits of the lawsuit using a summary-judgment-like procedure at an early stage of the litigation." (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 192 (*Varian*).)

Section 425.16 provides in pertinent part: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the

8

claim." (§ 425.16, subd. (b)(1).) Resolution of an anti-SLAPP motion "thus involves two steps. 'First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one "arising from" protected activity. [Citation.] If the court finds such a showing has been made, it then must consider whether the plaintiff has demonstrated a probability of prevailing on the claim.' " (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 819–820.) " 'Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute.' " (*Id.* at p. 820.)

"An ' "act in furtherance of a person's right of petition or free speech …" ' includes any written or oral statement made before a legislative, executive, or judicial body, or any other official proceeding authorized by law, or in connection with an issue under consideration by such body or in such proceeding. (§ 425.16, subd. (e)(1) & (2).) The moving party need not separately demonstrate that such an oral or written statement concerns an issue of public significance." (*Midland Pacific Building Corp. v. King* (2007) 157 Cal.App.4th 264, 271.) The statute is construed broadly to maximize protection for acts in furtherance of the right to petition. (§ 425.16, subd. (a) ["The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process. To this end, this section shall be construed broadly."].)

For purposes of both prongs of an anti-SLAPP motion, "[t]he court considers the pleadings and evidence submitted by both sides, but does not weigh credibility or compare the weight of the evidence. Rather, the court's

9

responsibility is to accept as true the evidence favorable to the plaintiff ...." (*HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212.) A defendant's burden on the first prong is not an onerous one. A defendant need only make a prima facie showing that plaintiff's claims arise from the defendant's constitutionally-protected free speech or petition rights. (See *Governor Gray Davis Com. v. American Taxpayers Alliance* (2002) 102 Cal.App.4th 449, 456.) With respect to the second prong, "in order to establish the requisite probability of prevailing (§ 425.16, subd. (b)(1)), the plaintiff need only have ' "stated and substantiated a legally sufficient claim." ' [Citations.] 'Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' " (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88–89.)

"Review of an order granting or denying a motion to strike under section 425.16 is de novo. [Citation.] [Like the trial court, we] consider 'the pleadings, and supporting and opposing affidavits … upon which the liability or defense is based.' (§ 425.16, subd. (b)(2).)" *(Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.) Our de novo review "includes whether the anti-SLAPP statute applies to the challenged claim." (*Thomas v. Quintero* (2005) 126 Cal.App.4th 635, 645.) "[W]e apply our independent judgment to determine whether" the claim arises from acts done in furtherance of the defendants' "right of petition or free speech in connection with a public issue." (*Ibid.*) "[W]e must then independently determine, from our review of the record as a whole, whether [the plaintiffs have] established a reasonable probability that [they will] prevail on [their] claims." (*Ibid.*)

## II

### *Motion to Dismiss Appeal*

In its motion to dismiss and respondent's brief, Curtin argues that because it dismissed its complaint against Pacific without prejudice during the pendency of this appeal, the appeal is now moot. We disagree and deny Curtin's motion to dismiss.

A defendant who prevails in moving to strike a complaint under section 425.16 is entitled to recover the attorney fees and costs it incurred in bringing the motion to strike. (§ 425.16, subd. (c).) This includes the right to recover such fees and costs incurred when prevailing as a respondent on appeal. (*Wilkerson v. Sullivan* (2002) 99 Cal.App.4th 443, 448; *Evans v. Unkow* (1995) 38 Cal.App.4th 1490.)

As a general matter, a plaintiff may voluntarily dismiss the complaint with or without prejudice upon request to the court clerk, prior to trial. (§ 581, subds. (b) & (c).) Once a notice of appeal has been filed in the trial court, however, section 916 provides for an automatic stay of trial court proceedings "upon the matters embraced" in or "affected" by the appeal. Because the trial court proceedings were stayed when Pacific filed its notice of appeal, the trial court lacked jurisdiction to dismiss the case thereafter. (*Varian, supra*, 35 Cal.4th at pp. 188–189 [trial court had no jurisdiction to proceed with trial and enter judgment after appeal filed from order denying anti-SLAPP motion to strike].)

Curtin argues that *Varian* only precludes a *trial court* from acting after the filing of an appeal, and here it was the clerk who performed a ministerial act in recording its request for dismissal. However, whether a matter is embraced in or affected by the appeal, and thus outside the jurisdiction of the trial court, turns not on whether the matter was handled by the clerk or the

11

judge, but on whether it would have any bearing on the effectiveness of the appeal. (*Varian, supra*, 35 Cal.4th at p. 189.) Here, dismissing the case would impact the effectiveness of Pacific's appeal, since it would foreclose the opportunity to recover attorney fees and costs as the prevailing party under section 425.16 upon reversal of the trial court's order denying Pacific's motion.

Because the trial court was without jurisdiction to dismiss the case during the pendency of the appeal, the dismissal is void on its face and does not render the appeal moot. Even if the dismissal were valid, we would not be compelled to dismiss the appeal as moot. " 'When no effective relief can be granted, an appeal is moot and will be dismissed.' " (*MHC Operating Limited Partnership v. City of San Jose* (2003) 106 Cal.App.4th 204, 214.) This court can grant effective relief because our reversal of the denial of Pacific's motion to strike the complaint entitles it to an award of attorney fees and costs under section 425.16, subdivision (c).[4]

---

[4] In support of its argument that the appeal is moot, Curtin relies primarily on an unpublished federal Ninth Circuit case, *Mireskandari v. Associated Newspapers, LTD.* (9th Cir. 2016) 665 Fed.Appx. 570. In addition to carrying no precedential value, the case is not analogous to the situation presented here. In *Mireskandari*, the defendant moved to strike all of the plaintiff's claims. (*Id.* at p. 571.) The court granted the motion with respect to all but two claims, which defendant appealed. (*Ibid.*) While the appeal was pending, the plaintiff dismissed the complaint and refiled the case in state court. (*Ibid.*) The appellate court dismissed the plaintiff's merits appeal as moot, but affirmed the trial court's attorney fees order, concluding both parties' challenge of the award, including defendant's appeal asserting the award was too low, was meritless. (*Id.* at p. 572.) *Mireskandari* does not support dismissal of this appeal, where defendants' challenge the *denial* of their motion to strike and are entitled to attorney fees under the statute if they succeed.

## III

### *Anti-SLAPP Order*

Pacific argues that Curtin failed to show a probability of success on the merits of its claim because the claim is precluded by federal maritime law. Curtin responds both that the trial court erred by finding its claim arises from protected activity, and that reversal on the second prong is unavailable because Pacific failed to establish its affirmative defense of preemption in the trial court and it showed its claim has merit. We agree with Pacific that the court correctly determined Curtin's claim arose from protected petitioning activity and that Curtin failed to meet its burden on the second prong of the anti-SLAPP analysis.

### A

With respect to the first prong on the anti-SLAPP analysis, Pacific argues the trial court correctly determined that Curtin's claim arose from its protected petitioning activity of obtaining a coastwise endorsement. Curtin responds that its claims are based on Pacific's "bidding and contracting practices," which do not fall within the protection of the anti-SLAPP statute.

" 'The phrase "arising from" in section 425.16, subdivision (b)(1) has been interpreted to mean that "the act underlying the plaintiff's cause" or "the act which forms the basis for the plaintiff's cause of action" must have been an act in furtherance of the right of petition or free speech.' " (*Kajima Engineering and Const., Inc. v. City of Los Angeles* (2002) 95 Cal.App.4th 921, 928–929 (*Kajima*).) Using *Kajima* as its model, Curtin attempts to reframe the basis of its claim, arguing it arises not from the protected activity of obtaining a coastwise endorsement from the Coast Guard, but instead asserting the claim arises from Pacific's act of bidding on the Santa Barbara dredging projects with an invalid coastwise endorsement.

13

The trial court rejected this argument. The court concluded, quoting the complaint, that Curtin's UCL claim "is based on [Pacific] 'submitting a false application for a coastwise endorsement for Sandpiper to the United States Coast Guard and then obtaining and performing the USACE Santa Barbara Harbor Maintenance Dredging contract with a dredge that was not built in the United States.' " The court continued, "[w]hile [Curtin] asserts that the act of performing a contract cannot be categorized as an act in furtherance of the right of petition or free speech, the gravamen of [Curtin's] allegations are that [Pacific] lied about the Sandpiper and consequently obtained and performed the contract[ ] as a result of the lie. … The performing of the contract is only wrongful because Defendants obtained a coastwise endorsement for Sandpiper through [allegedly] dishonest means."

We agree with the trial court that the basis for Curtin's claim is not the bidding and performance of the contract, but rather Curtin's allegation that Pacific obtained a coastwise endorsement (allowing it to compete with Curtin) based on falsified information. As the trial court correctly pointed out, without this fundamental allegation, Curtin has no basis for its claim. Accordingly, the claim arose from protected petitioning activity. (See *Midland Pacific Building Corp. v. King, supra*, 157 Cal.App.4th at p. 272 ["The focus of the statute is not the form of the plaintiff's cause of action, but the defendant's activity that gives rise to the asserted liability."].)

*Kajima*, on which Curtin primarily relies, is unlike this case and supports our holding that its claim arose from protected activity. In *Kajima*, a contractor for the City of Los Angeles filed suit against the City for breach of contract. (*Kajima, supra*, 95 Cal.App.4th at pp. 924–925.) The City counter-sued for breach of contract and fraud, and the contractor moved to strike the City's complaint on the ground that it arose from the contractor's

protected activity of bringing the initial claims. (*Id.* at p. 925.) The trial court denied the motion with respect to all but one claim, finding the breach of contract claims did not arise from protected activity but instead were related to the contractor's performance of the work it was contracted for by the City. (*Id.* at p. 926.)

The court of appeal affirmed, reiterating the principal that "oppressive litigation tactics" alone do not support an anti-SLAPP. (*Kajima, supra*, 95 Cal.App.4th at pp. 933–934.) Rather, to obtain protection from the statute, the claims themselves must arise from the speech or petitioning activity. (*Ibid.*) In *Kajima*, the City's claims were based on conduct of the contractor that occurred well before it filed suit, not on the filing of the suit. Here, as explained, the claims arose from Pacific's conduct of obtaining a coastwise endorsement from the Coast Guard, protected petitioning activity under section 425.16, subdivision (e), not the actual work performed under the contract.

B

With respect to the second prong of the anti-SLAPP analysis, as an initial matter we reject Curtin's assertion that Pacific's argument is waived for purposes of appeal. As noted, the moving party's burden on an anti-SLAPP motion is to establish that the claims at issue arose from protected activity. Once that burden is satisfied, the party opposing the motion must show a probability of prevailing on its claims. This burden includes overcoming any legal defense raised by the defendant. (See *Traditional Cat Assn., Inc. v. Gilbreath* (2004) 118 Cal.App.4th 392, 398 [the anti-SLAPP statute "contemplates consideration of the substantive merits of the plaintiff's complaint, as well as all available defenses to it, including, but not limited to constitutional defenses"].) Further, even if the issue is one not

15

raised in the trial court, so long as the relevant facts are not in dispute, the existence of a legal defense that precludes the claim is properly considered on appeal. (See *Argentieri v. Zuckerberg* (2017) 8 Cal.App.5th 768, 789 [determining that its consideration of a defense not directly raised by parties below was proper].)[5]

In addition, although Pacific's points and authorities in support of its motion did not raise the defense, its answer to Curtin's complaint included four affirmative defenses asserting Curtin's UCL claim based exclusively on a violation of the Jones Act was not viable. The answer asserted the trial court was without jurisdiction to hear the claim, the claim was preempted, the claim was subject to deference to the Coast Guard's enforcement powers, and the claim was subject to the primary jurisdiction of the Coast Guard. Indeed, Curtin's brief opposing the motion to strike argued that the defense of preemption was not available because it's UCL lawsuit furthered the purposes of the Jones Act and was not in conflict with the law.

Further, at the hearing on its motion, Pacific's counsel opened his argument by asserting that Curtin was trying to circumvent the Coast Guard's coastwise determination and that the threshold issue was whether Curtin could prevent Pacific from using its valid coastwise endorsement by the Coast Guard. These arguments sufficiently raised the issue of whether

---

[5]    In support of its argument that Pacific waived the defense for purposes of its anti-SLAPP motion by not briefing the issue more thoroughly in the trial court, Curtin cites *People v. Braum* (2020) 49 Cal.App.5th 342 and *Carian v. Dept. of Fish & Wildlife* (2015) 235 Cal.App.4th 806. These cases are not relevant to the issues here. Neither involved an anti-SLAPP motion and both involved attempts to introduce new facts on appeal. (See *Braum,* at p. 362 [rejecting new factual arguments on appeal from judgment entered after summary judgment] and *Carian,* at p. 819 [rejected new factual arguments on appeal from denial of motion for attorney fees under section 1021.5].)

the trial court had the authority to reexamine the Coast Guard's conclusion that Pacific had not violated the Jones Act. (See *In re A.J.* (2019) 39 Cal.App.5th 1112, 1117 [no waiver on appeal where objection sufficient to inform the court and opposing party of the issue].)

C

As discussed, Pacific argues that the trial court erred by finding Curtin had met its burden to show a probability of prevailing on the claim because the alleged violation of the Jones Act, the sole basis for the claim, is preempted by federal law. Curtin responds that the ruling was correct because there was a question of material fact as to whether the Sandpiper was actually assembled in Mexico, and this question cannot be resolved in Pacific's favor as a matter of law. We disagree with Curtin. Because the Coast Guard is the sole arbiter of whether a vessel is eligible for the coastwise endorsement, and here determined the Sandpiper is eligible, Curtin cannot prevail on its claim as a matter of law and the motion to strike must be granted.

1.

"Under the supremacy clause of the United States Constitution (U.S. Const., art. VI, cl. 2), federal law 'shall be the supreme Law of the Land.' (*Brown v. Mortensen* (2011) 51 Cal.4th 1052, 1059 (*Brown*).) Therefore Congress may preempt state laws to the extent it believes such action is necessary to achieve its purposes." (*Fischer v. Time Warner Cable Inc.* (2015) 234 Cal.App.4th 784, 790–791 (*Fischer*).)

"Congress may exercise that power expressly, or the courts may infer preemption under one of three implied preemption doctrines: conflict, obstacle, or field preemption. (*Brown, supra*, 51 Cal.4th at p. 1059.) Express preemption occurs when Congress defines the extent to which a statute

17

preempts state law. (*Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 935.) Conflict preemption exists when it is impossible to simultaneously comply with both state and federal law. (*Ibid.*) Obstacle preemption occurs when state law stands in the way of full accomplishment and execution of federal law. (*Ibid.*) Field preemption applies when comprehensive federal regulations leave no room for state regulation." (*Fischer, supra*, 234 Cal.App.4th at p. 791.)

"Preemption may be based either on federal statutes or on federal regulations that are properly adopted in accordance with statutory authorization. As a result, a federal agency acting within the scope of its congressionally delegated authority may preempt state regulation and 'render unenforceable state or local laws that are otherwise not inconsistent with federal law.' " (*Fischer, supra*, 234 Cal.App.4th at p. 791.)

"In pre-emption analysis, courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.' " (*Arizona v. United States* (2012) 567 U.S. 387, 400.) "[B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action. In all pre-emption cases, and particularly in those in which Congress has 'legislated ... in a field which the States have traditionally occupied,' [citation], we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " (*Medtronic, Inc. v. Lohr* (1996) 518 U.S. 470, 485 (*Medtronic*).)

However, the primacy of state police power is not universal. "An assumption of nonpre-emption is not triggered when the State regulates in

18

an area where there has been a history of significant federal presence." (*United States v. Locke* (2000) 529 U.S. 89, 108 (*Locke*).)

2.

Contrary to Curtin's arguments, the presumption against preemption that applies in other regulatory contexts is not appropriate here. Unlike the cases in other areas Curtin cites, there is a lengthy history of significant federal presence in the regulation of maritime activity. (See, e.g., *Locke, supra*, 529 U.S. at p. 99 ["The authority of Congress to regulate interstate navigation, without embarrassment from intervention of the separate States and resulting difficulties with foreign nations, was cited in the Federalist Papers as one of the reasons for adopting the Constitution."].) "The federal acts and regulations with respect to vessels on the navigable waters of the United States are elaborate." (*Kelly v. Washington* (1937) 302 U.S. 1, 4.) Thus, unlike other areas of federal law, maritime activity is "an area traditionally within the purview of federal regulation" and not entitled to a presumption against conflict preemption. (*LaPlante v. Wellcraft Marine Corp.* (2001) 94 Cal.App.4th 282, 290.)

That is especially true with respect to the Jones Act requirement at issue here, mandating vessels engaged in coastwise trade in the country's navigable waters be U.S.-built. In *Douglas*, the U.S. Supreme Court explained that "[t]he basic form for the comprehensive federal regulation of trading and fishing vessels was established in the earliest days of the Nation and has changed little since. Ships engaged in trade with foreign lands are 'registered,'.... 'The purpose of a register is to declare the nationality of a vessel ... and to enable her to assert that nationality wherever found.' [Citations.] Vessels engaged in domestic or coastwise trade or used for fishing are 'enrolled'.... 'The purpose of an enrollment is to evidence the

19

national character of a vessel and to enable such vessel to procure a license.' " (*Douglas v. Seacoast Projects, Inc.* (1977) 431 U.S. 265, 272–273 (*Douglas*).)

3.

The vessel documentation and coastwise trade laws are extensive and are set forth in the U.S. Code and administered by the Coast Guard. Under the current vessel documentation and coastwise trade laws, a qualified vessel may participate in the U.S. coastwise trade "only if the vessel has been issued a certificate of documentation with an endorsement for that trade ...." (46 U.S.C. § 12102(a).) A certificate of documentation may be obtained from the Coast Guard by filing an Application for Initial Issue, Exchange, or Replacement of Certificate of Documentation. (46 U.S.C. § 12104; 46 C.F.R. § 67.141.) A Certificate of Documentation with a coastwise endorsement may be issued upon the filing of the application and a "determination of qualification by the Director, National Vessel Documentation Center ...." (46 C.F.R. § 67.15(b).) At that point, "a vessel for which a coastwise endorsement is issued may engage in the coastwise trade." (46 U.S.C. § 12112(b).)

The Coast Guard's process for determining if a vessel is considered U.S.-built is set forth in the Coast Guard's regulations. Under 46 C.F.R. section 67.97, a vessel is considered U.S.-built if "(a) [a]ll major components of its hull and superstructure are fabricated in the United States; and (b) [t]he vessel is assembled entirely in the United States." Additional regulations provide that if a vessel is "later rebuilt outside the United States," it can be disqualified from obtaining a coastwise endorsement if either "a major component of the hull or superstructure" was not built in the U.S., or if the work performed abroad "constitutes more than 10 percent of the vessel's ... discounted lightship weight." (46 C.F.R. § 67.177(a) and (b)(1); *Shipbuilders Council of Am., Inc. v. United States Coast Guard* (4th Cir.

20

2009) 578 F.3d 234, 241.) Once a vessel obtains its certificate of documentation with its coastwise endorsement from the Coast Guard, a federal statute provides the certificate is "conclusive evidence of qualification to engage in a specified trade…." (46 U.S.C. § 12134.)

The Coast Guard has the authority to enforce its documentation requirements. 46 U.S.C. section 12151(b)(1) and (2) authorize the Coast Guard to seize a vessel if its owner makes misrepresentations in applying for or using a certificate of documentation. In addition, misstatements on an application for a certificate of documentation are subject to monetary penalties of up to $15,000 per day, as well as criminal penalties including fines and imprisonment. (46 U.S.C § 12151; 18 U.S.C. § 1001.) The Coast Guard's regulations and authorizing statutes also provide for administrative review of its actions. Under 46 C.F.R. section 67.12, "[a]ny person directly affected by a decision or action taken under this part by or on behalf of the Coast Guard may appeal therefrom …."[6]

We agree with Pacific that these extensive federal provisions give the Coast Guard the exclusive authority to determine eligibility for a coastwise endorsement, and this authority cannot be circumvented by a UCL claim

---

[6] Similarly, 46 C.F.R. section 1.03-45, titled "Appeals from decisions or actions involving documentation of vessels," states "Any person directly affected by a decision or action of an officer or employee of the Coast Guard acting on or in regard to the documentation of a vessel under part 67 or part 68 of this title, may make a formal appeal of that decision or action to the Director of Inspections and Compliance (CG–5PC), in accordance with the procedures contained in § 1.03–15 of this subpart. The decision of the Director of Inspections and Compliance (CG–5PC), on such an appeal will constitute final agency action." Under 46 C.F.R. section 1.03-15, an appeal must be made within 30 days of the Coast Guard decision or action.

based exclusively on a violation of the Jones Act.[7]  Allowing such a claim creates a potential conflict between state and federal law.  Indeed, in this case Curtin is specifically seeking such a conflict, asking the state court to reevaluate the documentation provided by Pacific to the Coast Guard and overturn the Coast Guard's determination that the Sandpiper was U.S.-built.  Such a result is not tenable.  (See *Buckman Co. v. Plaintiffs' Legal Committee* (2001) 531 U.S. 341, 350 (*Buckman*) [holding "state-law fraud-on-the-FDA claims" (i.e., state tort claims for injury caused by a medical device approved by the Food and Drug Administration (FDA) based on alleged misrepresentation to the FDA) "inevitably conflict with the FDA's responsibility to police fraud" and are thus preempted]; *Nathan Kimmel, Inc. v. DowElanco* (9th Cir. 2002) 275 F.3d 1199, 1205 (*Kimmel*) [plaintiff's claim for intentional interference with prospective economic advantage, based on a claim that pesticide manufacturer submitted false information to the federal Environmental Protection Agency (EPA), was preempted by comprehensive federal regulatory scheme aimed at controlling the use, sale, and labeling of pesticides].)

Curtin asserts "Pacific does not and cannot argue that compliance with state and federal law is impossible."  This assertion is wrong.  The core of Pacific's argument is that compliance with Curtin's interpretation of the UCL

_____

[7]  Curtin devotes several pages in its brief to argue that the Jones Act does not create field preemption.  We agree.  The federal statutory and regulatory scheme allows for supplemental state regulation of waters within their borders that *does not conflict* with federal law.  (See, e.g., *Douglas, supra*, 431 U.S. at p. 277 [Holding Virginia law prohibiting non-resident vessels, enrolled and licensed under federal law, from fishing in its waterways was preempted, but noting "that States may impose upon federal licensees reasonable, nondiscriminatory conservation and environmental protection measures otherwise within their police power."].)

and compliance with the federal law is not possible. As explained, Pacific has complied with federal law. The Coast Guard investigated the same complaint raised by Curtin in this litigation and concluded that the Sandpiper was U.S.-built and properly awarded a coastwise endorsement. Now, Curtin asks the state court to override this determination and find that under the Jones Act the Sandpiper is not U.S.-built. Such a determination directly conflicts with the valid federal determination obtained by Pacific and therefore is preempted.

The case both parties cite extensively, *Buckman*, supports this determination. In *Buckman*, the plaintiffs sued a consultant for the manufacturer of a medical device, orthopedic bone screws, who assisted in obtaining approval of the device from the FDA. The plaintiffs, who were injured by the device, asserted the consultant made fraudulent misrepresentations to the FDA that resulted in improper approval, and that as a result the consultant was liable under state tort law for injuries caused by the devices. (*Buckman, supra*, 531 U.S. at pp. 347–348.) Resolving a split of authority as to whether such claims were preempted by the Federal Food, Drug, and Cosmetics Act (FDCA) as amended by the Medical Device Amendments of 1976 (MDA), the U.S. Supreme Court held the claims were preempted. (*Id.* at p. 347.)

In so holding, the court first determined there was no presumption against preemption because "the relationship between [the] federal agency and the entity it regulates is inherently federal in character," and "[p]olicing fraud against federal agencies is hardly 'a field which the States have traditionally occupied ….' " (*Buckman, supra*, 531 U.S at p. 347.) The court then held the plaintiff's "fraud-on-the-FDA" claims impermissibly conflicted with the regulatory scheme established by the FDCA and MDA. (*Ibid.*) The

court noted that the misrepresentations at issue were "prompted by the MDA, and the very subject matter of [the consultant's] statements were dictated by that statute's provisions." (*Id*. at pp. 347–348.)

The court concluded that Congress had enacted the comprehensive scheme to regulate the process in which the allegedly fraudulent statements had been submitted to the FDA. The regulations set forth specific disclosure requirements accompanied by various provisions aimed at detecting, deterring, and punishing false statements. (*Buckman, supra*, 531 U.S at p. 348.) Because maintaining a flexible approach to enforcement was "a critical component of the statutory and regulatory framework under which the FDA pursue[d] difficult (and often competing) objectives," the state law fraud-on-the-FDA claims would "inevitably conflict with the FDA's responsibility to police fraud consistently with the [FDA]'s judgment and objectives." (*Id*. at pp. 349–350.) In addition, the court concluded the claims would frustrate federal regulatory objectives by increasing the burdens on the FDA's processes. (*Id*. at p. 351.)

Critically, in distinguishing cases where a presumption against preemption was applied, the court explained that unlike cases based on traditional tort law principals, the claims "exist[ed] solely by virtue of the FDCA disclosure requirements." (*Buckman, supra*, 531 U.S. at p. 353.) Just as in *Buckman*, the relationship between Pacific and the Coast Guard is "inherently federal in character." (*Id*. at p. 347.) The U.S.-built requirement is created solely by the Jones Act, no parallel state requirement exists. Pacific's dealings with the Coast Guard were "prompted by" the Jones Act, and the requirement that its vessel be U.S.-built was "dictated by that statute's provisions." (*Id*. at pp. 347–348.) As in *Buckman*, the requirement that the Sandpiper be U.S.-built to be eligible for a coastwise endorsement

24

(and therefore eligible for the USACE contracts) "originates from, is governed by, and terminates according to federal law."[8] (*Id*. at p. 347.)

Allowing a state law claim under the UCL premised only on this violation of the Jones Act conflicts with the accomplishment of the regulatory objectives given to the Coast Guard by the U.S. Congress. Allowing such a claim imposes extraneous burdens on the administration of strictly federal vessel documentation laws by subjecting applicants to "the shadow of 50 states' tort regimes." (*Buckman, supra*, 531 U.S at pp. 350–351.) The burdens of such litigation would increase the costs of vessel certification, potentially frustrating coastwise trade and undermining the Coast Guard's ability to accomplish its regulatory obligations.

Further, allowing such a claim conflicts with the enforcement scheme established by federal law and administered by the Coast Guard, which includes severe penalties for a violation of the Jones Act like that alleged here. Critically, permitting Curtin's claim creates a danger (one Curtin invites) that state courts will find liability based on their own construction or

---

[8] Curtin asserts that an "essential aspect of *Buckman*'s reasoning" was that the FDCA expressly prohibits private enforcement of its requirements and that the Jones Act contains no such prohibition, taking it outside the scope of *Buckman*'s preemption holding. According to Curtin, the lack of a federal right of action here weighs against preemption. Curtin misconstrues *Buckman*. Where, as here, there are significant enforcement mechanisms in place, the lack of a private right of action does not lead to the conclusion that there is no preemption. *Buckman*'s holding was limited to the preemption by the FDCA of the state law fraud-on-the-FDA claims at issue, and did not apply to every claim that involved a violation of the FDCA. *Buckman* distinguished the claims found not to be preempted in *Medtronic, supra*, 518 U.S. 470, which were based on a manufacturer's alleged failure to use reasonable care in the production of the product *and* violation of the FDCA. (*Buckman, supra*, 531 U.S. at p. 352.) Thus, the existence of a prohibition of private enforcement was not central to *Buckman* in the way Curtin contends. Rather it is one factor to be considered in the conflict preemption analysis.

application of law that conflicts with the interpretation of the agency, the Coast Guard, charged with administering the law. (*See Kimmel, supra,* 275 F.3d at pp. 1206–1207 ["we are troubled that an applicant's disclosure under [the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA)] FIFRA, although not challenged by the EPA (the very agency empowered by Congress to enforce FIFRA), may be judged illegal under state law"].)

Our conclusion that Curtin's claim is preempted is distinguishable from the cases Curtin cites that involve state claims that parallel a federal law, but do not conflict with it. These cases involve situations where the state law remedies at issue supplement the federal claim or provide stricter standards. For example, in *Rose v. Bank of America, N.A.* (2013) 57 Cal.4th 390, the court held that a UCL claim premised on the bank defendant's violation of the federal Truth in Saving Act (TISA, 12 U.S.C. § 4301, et seq.) was permissible. Despite a recent congressional repeal of a private right of action under TISA itself, which the bank argued showed congressional intent to preempt private claims under state law, the federal law expressly "preserve[d] the authority of states to regulate bank disclosures so long as state law is consistent with TISA." (*Rose,* at p. 394.) Accordingly, the court held that an action under the UCL based on TISA did not create a conflict

with the federal law.9  (See also *McClellan v. I-Flow Corp.* (9th Cir. 2015) 776 F.3d 1035, 1040–1041 [rejecting preemption of state tort claim against manufacturer of medical device based on failure-to-warn theory; distinguishing *Buckman* because claims were not based on representations made to the FDA]; *Stengel v. Medtronic Inc.* (9th Cir. 2013) 704 F.3d 1224, 1233 [state-law negligence claim based on a failure-to-warn the FDA of risks associated with a previously approved medical device "not preempted, either expressly or impliedly, by the MDA" because it "rests on a state-law duty that parallels a federal-law duty under the MDA"].); *Quesada v. Herb Thyme Farms, Inc.* (2015) 62 Cal.4th 298 304, 323–324(*Quesada*) [state truth-in-advertising claims not preempted by federal organic certification programs because they do not interfere with "Congress's purposes and objectives of establishing uniform national standards for organic production and labeling"]; and *Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1098–1099 [UCL claims based on California law mirroring federal law not preempted].)

---

9      Curtin states that a federal district court case cited by Pacific, which analyzed an almost identical claim to Curtin's, *Offshore Service Vessels, L.L.C. v. Surf Subsea, Inc.* (E.D. La., Oct. 17, 2012, No. CIV.A. 12-1311) 2012 WL 5183557, should not be followed because it erroneously based its finding of preemption solely on "the existence of an 'enforcement scheme established by federal law and administered by a federal agency.' "  This is not a fair characterization of the case.  Like here, the district court relied on *Buckman* and other preemption decisions to conclude that a violation of the Louisiana Unfair Trade Practices and Consumer Protection Law could not be based on the Jones Act where the Coast Guard had issued a valid coastwise endorsement.  (*Id.* at pp. *8-14.)  The decision was based on the court's determination that its adjudication of the claim was *in conflict* with the enforcement scheme established by the Jones Act and enforced by the Coast Guard; not solely because of the scheme's existence.  (*Ibid.*)

In contrast, here, Curtin seeks to use the UCL to overturn a federal determination of coastwise endorsement eligibility—creating a direct conflict with the federal regulator's decision. Curtin can point to no underlying state policy that would support an independent basis for it to challenge the Coast Guard's determination. Only federal law prohibits the use of vessels constructed abroad in coastwise trade. (Cf. *Quesada, supra*, 62 Cal.4th at pp. 310, 313 [federal Organic Foods Act acts as a floor, not a ceiling on the policing of mislabeling and deception in the sale of food, which "is quintessentially a matter of long-standing local concern"], and *id*. at p. 323 [UCL and false advertising claims "do not contest [defendant's] ability to do anything its federal certification [under the Organic Food Acts] permits it to do."].) Curtin's assertion that conflict preemption does not apply because "consumer protection laws such as the UCL" are "within the states' historic policing powers," does not adequately account for the nature of its only claim, which is based solely on the violation of the federal Jones Act and without which its case has no basis. In other words, no state concern is involved in the "unfair competition" Curtin alleges Pacific engaged in.

Finally, it is no answer to say, as Curtin does, that its UCL claim "seeks only to ensure Pacific fairly competes with [Curtin] by complying with the Jones Act's requirement that vessels be assembled entirely in the United States," and that Curtin "would have that claim even if Pacific had never sought or received a coastwise endorsement." This is not the situation before us, and we decline to speculate on the viability of such a claim. Here the Coast Guard examined the Sandpiper and the documentation of its construction and determined it was entirely U.S.-built, and eligible for coastwise endorsement. This determination cannot be re-adjudicated by a

state court under the UCL in the manner advanced by Curtin.  Thus, Curtin failed to meet its burden to show a probability of prevailing on its claim.

DISPOSITION

The trial court's order denying Pacific's motion to strike is reversed. On remand the trial court is directed to reinstate the case and issue an order granting the anti-SLAPP motion and striking Curtin's claim.  Costs are awarded to appellant.

McCONNELL, P. J.

WE CONCUR:

HALLER, J.

IRION, J.